IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| TENNESSEE TELEPHONE | ) | Chapter 11 |
| SERVICE, LLC | ) | Case No. 310-08252 |
| | ) | Judge Lundin |
| Debtor. | ) | |

**EXPEDITED MOTION FOR AN ORDER (a) AUTHORIZING THE REJECTION OF MEMORANDUM OF UNDERSTANDING, (b) DETERMINING THAT THE DEBTOR HAS PROVIDED ADEQUATE ASSURANCE TO AT&T, AND (c) COMPELLING AT&T TO PROCESS NEW CUSTOMERS FOR DEBTOR OR, IN THE ALTERNATIVE, ENJOINING AT&T FROM SUSPENDING DEBTOR'S ORDERING CAPABILITIES**

Pursuant to Local Rule 9075-1, Tennessee Telephone Service, LLC (the "Debtor") respectfully requests that the Court enter an order scheduling a hearing on an expedited basis to consider this Motion for an order (a) authorizing the Debtor to reject a Memorandum of Understanding between the Debtor and BellSouth Telecommunications, Inc. d/b/a AT&T ("AT&T"), (b) determining, to the extent necessary, that the Debtor has provided adequate assurance to AT&T in the form of a $600,000 surety bond, and (c) compelling AT&T to process new customer requests submitted by the Debtor or, in the alternative, enjoining AT&T from suspending the Debtor's ordering capabilities. In support hereof, the Debtor states:

1.  The Debtor hereby seeks an order (a) authorizing the Debtor to reject a Memorandum of Understanding between the Debtor and AT&T pursuant to 11 U.S.C. § 365, (b) determining, pursuant to 11 U.S.C. § 366, or any other section under which AT&T may claim a right to assurance, that the Debtor has provided adequate assurance of payment to AT&T in the form of a $600,000 surety bond, and (c) compelling AT&T to process new customer requests

1

submitted by the Debtor, pursuant to the provisions of 11 U.S.C. § 362(a), or, in the alternative, enjoining AT&T from suspending the Debtor's ordering capabilities pursuant to 11 U.S.C. § 105(a).

2. The relief sought herein is urgent if the Debtor is to be successful in its reorganization efforts. The Debtor's business depends upon its ability to purchase telephone services from AT&T (which it, in turn, sells to customers). If the relief sought herein is not granted on an expedited basis, the Debtor will not be able to operate in a manner that would it allow it to reorganize.

3. Notice of this motion is being delivered via ECF to AT&T's counsel, Robert Goodrich, and the Office of the United States Trustee via ECF notice and electronic mail. Notice will also be sent by U.S. Mail to the other parties on the list of twenty largest creditors. The Debtor submits that the relief sought in this Motion would negatively impact AT&T only.

4. The Debtor requests that the Court set August 10, 2010 at 12:00 noon as the deadline for filing objections to this Motion, and set a hearing in this matter for August 10, 2010 at 1:00 p.m., or as soon as practicable thereafter. Undersigned counsel submits that he has made counsel for AT&T aware that the Debtor intended to have this matter heard on the afternoon of August 10, 2010.

**JURISDICTION**

5. This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O), and 11 U.S.C. §§ 105, 362, 365 and 366 (Title 11 of the United States Code shall be referred to hereinafter as "the Bankruptcy Code").

## BACKGROUND

6. On August 4, 2010 (the "Petition Date"), the Debtor filed a voluntary petition in the United States Bankruptcy Court for the Middle District of Tennessee for relief under Chapter 11 of the Bankruptcy Code. Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtor is continuing to operate its business as a debtor-in-possession. No trustee or examiner has been appointed in this case, nor has any official creditors' or equity security holders' committee been formed.

7. Since 2000, the Debtor has engaged in the business of providing local and long distance telephone services to customers in 9 Southeastern States. Today, the Debtor has approximately 7500 customers, thirty-five percent of which are within the State of Tennessee. The Debtor provides telephone services to both businesses and individuals. The majority of the Debtor's customers are low-income individuals who are unable to obtain telephone services from many telephone service providers.

8. In order to provide telephone services to its customers, the Debtor purchases telephone service from AT&T at wholesale prices. The Debtor in turn sells those services to its customers. The relationship between the Debtor and AT&T is governed by an Interconnection Agreement ("ICA") that has been filed with and approved by regulatory authorities in each of the nine states in which the Debtor operates.

9. Pursuant to federal telecommunications law, AT&T has an obligation to provide telephone services to certain companies, such as the Debtor, at wholesale prices. Federal telecommunications law also mandates that AT&T must provide any rebate or incentive offered to AT&T's customers to companies such as the Debtor. The result of this billing framework is that, while the Debtor will owe AT&T money each month for the services it purchases, AT&T

3

will owe the Debtor certain rebates or credits for the incentives to which it is entitled.

10. Historically, the Debtor has setoff (and AT&T has allowed the Debtor to setoff) the rebates to which it is entitled against the amount it owes AT&T each month for services. Recently, AT&T informed the Debtor that the ICA under which the Debtor operates does not allow this setoff and that AT&T would no longer accept the setoff. This has proven very detrimental to the Debtor's business as AT&T bills the Debtor at a much faster rate than it processes claims to rebates. As of the Petition Date, the Debtor alleges that AT&T owes it $3,600,000 in outstanding claims (against $2,900,000 of disputed charges alleged by AT&T).

11. As a result of AT&T's new payment demands, the Debtor's monthly expenses skyrocketed. Further adding to the Debtor's cash flow problems, AT&T demanded payment from the Debtor of $2,900,000 prior to the Petition Date. On July 22, 2010, the parties entered into a Memorandum of Understanding that was intended to govern the terms by which the alleged balance was to be repaid to AT&T.

12. One of the requirements of the Debtor under the Memorandum of Understanding was that the Debtor was required to obtain a $600,000 surety bond. On or about July 27, 2010, the Debtor presented a $600,000 surety bond issued by Travelers' Insurance to AT&T. AT&T rejected this bond because $400,000 of the bond insured only debts that accrued in the future.

13. Thereafter, but prior to the Petition Date, AT&T took action to suspend the Debtor's ability to submit to AT&T orders for new customers. AT&T also threatened to terminate service to the Debtor's existing customers pursuant to the Memorandum of Understanding and/or the ICA. While AT&T has not terminated service, it continued its refusal to process orders for new customers on behalf of the Debtor.

14. The Debtor's inability to submit new orders to AT&T has, in the very least,

frozen the Debtor's business. Indeed, a number of the Debtor's current customers do not pay their monthly telephone bills until services are disconnected; AT&T's refusal to process new customer orders means that the Debtor cannot honor the requests of disconnected customers who wish to reinstitute their services with the Debtor.

### **REJECTION OF MEMORANDUM OF UNDERSTANDING**

15. By this Motion, the Debtor seeks to reject the "Memorandum of Understanding" that it entered into with AT&T on July 22, 2010. A copy of the Memorandum of Understanding is attached hereto as <u>Exhibit A</u>. The Debtor states that the Memorandum of Understanding is burdensome and that rejection is in the best interest of this estate.

16. Section 365 of the Bankruptcy Code allows a debtor-in-possession to move for the assumption or rejection of any executory contract. While Section 365 does not defined the term "executory contract," it "generally includes contracts on which performance remains due to some extent on both sides." H.R. Rep. No. 595, 95th Cong., 1st Sess. 347 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 58 (1978).

17. The Memorandum of Understanding is an executory contract. It requires actions of both parties that remain unfulfilled. As such, it is within the Debtor's discretion to reject it.

18. The Debtor has not yet made a determination regarding whether it will assume or reject the ICA. Accordingly, with the rejection of the Memorandum of Understanding, the Debtor will continue making payments pursuant to the ICA until it determines whether to assume or reject that agreement.

19. The Debtor anticipates that AT&T might argue that the Memorandum of Understanding is an amendment to the ICA, thereby requiring that the Debtor assume or reject the ICA and the subsequent Memorandum of Law as a whole. Such an interpretation, if posited

by AT&T, is incorrect. First, the Memorandum of Understanding nowhere identifies itself as an amendment to the ICA, nor does it incorporate the ICA. Further, if the Memorandum of Understanding were an amendment to the ICA, AT&T would be compelled to follow the procedures detailed in 47 U.S.C. § 252 for approval of the amendment by the regulatory authority for each state in which the Debtor operates. This procedure was not followed.

20. For the reasons stated herein, the Debtor respectfully requests that this Court grant it approval to reject the Memorandum of Understanding pursuant to 11 U.S.C. § 365.

## ADEQUATE ASSURANCE

21. The Debtor does not believe that it is compelled at this juncture to offer adequate assurance of payment to AT&T. However, should AT&T claim that it is entitled to adequate assurance under § 366 or any other statute, the Debtor submits that it has provided such assurance to AT&T.

22. Attached hereto as Exhibit B is a bond issued by Travelers Insurance in favor of AT&T in the amount of $600,000. This bond is sufficient to insure more than two months of post-petition payments to AT&T (based upon the Debtor's calculation of its average monthly bill of $275,000). While the Debtor contends that its cash flow will be sufficient to pay AT&T for all post-petition services rendered, the bond certainly provides adequate assurance of that payment.

23. A surety bond is specifically listed as an acceptable assurance of payment in Section 366(c)(1)(A). The bond's amount, representing two months' of service, is certainly adequate in this situation. Should the Debtor fail to timely pay for its post-petition services, AT&T would have sufficient opportunity to seek relief from this Court while still being covered by the terms of the bond.

24. Therefore, the Debtor asks this Court to determine that it has provided AT&T adequate assurance of payment pursuant to § 366 or any other provision of the Bankruptcy Code to which AT&T may cite at this time.[1]

## REQUIRE AT&T TO PROCESS NEW CUSTOMER REQUESTS

25. Finally, but perhaps most importantly for this case, the Debtor asks that the Court compel AT&T to process new customer orders submitted by the Debtor to comply with the provisions of § 362(a) or, alternatively, enjoin AT&T from denying new customer processing to the Debtor pursuant to § 105. The Debtor submits that the ability to add new customers to its business is essential to its reorganization efforts.

26. 11 U.S.C. § 362(a)(6) forbids a creditor from taking "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title. . . ." AT&T's refusal to process new customer orders, submitted by the Debtor pursuant to the terms of the ICA, is a clear violation of this provision. Despite undersigned counsel's requests of AT&T, it has refused to process new customer orders consistent per the ICA.

27. The Debtor anticipates that AT&T will take the position that, since it exercised its rights under the ICA to suspend new orders prior to the Petition Date, it has not violated the automatic stay. This argument is misplaced. Courts around the country, including those within the Sixth Circuit, have held that a creditor's post-petition refusal to honor new business requests violates § 362, even if the creditor originally instituted the refusal prepetition. For example, in *Sportfame of Ohio, Inc. v. Wilson Sporting Goods Co.*, 40 B.R. 47 (Bankr. N.D. Ohio 1984), the creditor began refusing shipment to the debtor prior to the petition date. Following the

---

[1] The Debtor recognizes that such a finding must be subject to AT&T's ability to subsequently allege that it is no longer adequately assured of the Debtor's payment. By this Motion, the Debtor in no way intends to preclude AT&T from so moving under changed circumstances.

bankruptcy filing, the debtor contacted the creditor and asked them to resume shipments on C.O.D. The creditor again refused to make additional shipments of product until the debtor paid its prepetition debts in full. Upon these facts, the Bankruptcy Court for the Northern District of Ohio found that the creditor had violated the automatic stay. *See also Olson v. McFarland Clinic P.C.*, 38 B.R. 515 (Bankr. N.D. Iowa 1984) (medical clinic's refusal to treat patient postpetition because of prepetition debt was violation of the automatic stay).

28. Further, the issues involved in this case are somewhat analogous to those involved in cases involving lenders who refuse to return a vehicle repossessed prior to the petition date, *see e.g., Spears v. Ford Motor Credit Co.*, 223 B.R. 159 (Bankr. N.D. Ill. 1998), academic institutions who refuse to release transcripts on account of unpaid prepetition balances, *see e.g., In re Kuehn*, 563 F.3d 289 (7th Cir. 2009), and states that refuse to lift the suspension of a drivers' license pending the payment of prepetition fines. In each of those fact scenarios, the creditor takes some prepetition action that it is contractually allowed to take but refuses to cease the activity postpetition. The drivers' license cases are especially instructive to this case. Those cases, like the one now before this Court, involve a *suspension* of certain privileges *prior to the petition date* which the respondent refuses to lift postpetition. In those drivers' license cases, the courts first examine whether the suspension of a license is an exercise of the state's police power, meant to enforce a criminal law or protect public safety. That inquiry is not necessary here because AT&T is not a state actor. Where courts have determined that the license suspension was put in place prepetition simply as a means of collecting a debt, they have held that refusal to lift the suspension constitutes a violation of the § 362 automatic stay provisions. *See e.g., In re Breto*, 2006 Bankr. LEXIS 4162 (Bankr. S.D. Fla. 2006).

29. In deciding whether an action violates § 362(a)(6), the Sixth Circuit has opined:

"a course of conduct violates *§ 362(a)(6)* if it '(1) could reasonably be expected to have a significant impact on the debtor's determination as to whether to repay, and (2) is contrary to what a reasonable person would consider to be fair under the circumstances.'" *Pertuso v. Ford Motor Credit Co., 233 F.3d 417, 423 (6th Cir. 2000)* (quoting *In re Briggs, 143 B.R. 438, 453 (Bankr. E.D. Mich. 1992))*. In this case, AT&T's refusal to process new customer requests has a significant impact on the Debtor's determination as to whether to repay (as evidenced by the plain language of the Memorandum of Understanding) and it is contrary to a reasonable sense of fairness. AT&T's "suspension" is a thinly-veiled attempt to force the Debtor to pay prepetition debts.

30. This Court should find that AT&T's continuing refusal to process new customer orders for the Debtor constitutes a violation of § 362. Rather than seeking monetary damages, the Debtor requests that the Court compel AT&T to begin processing these new orders. Should the Court refrain from doing so, the Debtor reserves the right to introduce evidence regarding the damage being caused by AT&T's action and seek a monetary penalty against AT&T.

31. Alternatively, the Debtor asks the Court to use its authority under 11 U.S.C. § 105 to enjoin AT&T from rejecting the Debtor's new customer orders.[2] This Court has inherent authority to enjoin any action that might impede the Debtor's reorganization efforts. *See e.g., LTV Corp. v. Miller,* 109 B.R. 613, 621 (S.D.N.Y. 1990) ("The power of the Bankruptcy Court to issue an injunction in order to preserve the integrity of the reorganization process is well established. . . . The reach of bankruptcy jurisdiction encompasses all matters the outcome of which could affect the debtor or its reorganization."). The four factors to be considered in

---

2 The Debtor believes that this issue is more properly brought as a motion to enforce the automatic stay, *see Amedisys v. National Century Financial Services, Inc.*, 423 F.3d 567, 578-79 (6th Cir. 2005), but asks the Court for injunctive relief in the alternative.

determining whether to grant an injunction pursuant to § 105(a) are: "(1) the likelihood of the plaintiff's success on the merits, (2) whether plaintiff will suffer irreparable injury without the injunction, (3) the harm to others which will occur if the injunction is granted, and (4) whether the injunction would serve the public interest." *In re Eagle-Picher Industries, Inc.,* 963 F.2d 855, 858 (6th Cir. 1992). The Debtor has demonstrated that AT&T will be adequately protected if it lifts the new order suspension; thus, likelihood of success has been established. In a Chapter 11 context, the irreparable harm element is met "where there is a showing that the action sought to be enjoined would embarrass, burden, delay or otherwise impede the reorganization proceedings or if the stay is necessary to preserve or protect the debtor's estate and reorganization prospects . . . ." *Alert Holdings, Inc. v. Interstate Protective Servs., Inc., 148 Bankr. 194,* 200 (Bankr. S.D.N.Y. 1992). Such is certainly the case here. There will be no harm to AT&T in light of the adequate assurance of payment. Finally, mandating that AT&T continue to honor new customer orders serves the public interest because, with its ordering capabilities restored, the Debtor can continue providing uninterrupted telephone service to its low-income customers.

32. Accordingly, the Court should compel AT&T to process new customer orders from the Debtor, in compliance with the provisions of § 362, or alternatively, enjoin AT&T from refusing to process new customer orders pursuant to the Court's § 105 powers.

## **CONCLUSION**

33. AT&T's continuing actions to collect prepetition debts from the Debtor pose a serious threat to the Debtor's ability to reorganize. In an attempt to preserve its ability to reorganize, the Debtor respectfully requests that the Court enter an order (1) allowing the Debtor to reject the Memorandum of Understanding between the Debtor and AT&T, (2) determining

10

Case 3:10-bk-08252    Doc 8    Filed 08/08/10    Entered 08/08/10 21:41:00    Desc Main
Document      Page 10 of 11

that the Debtor has provided adequate assurance of payment to AT&T, (3) compelling AT&T to process new customer orders submitted by the Debtor or, in the alternative, enjoining AT&T's continued suspension of new orders, and (4) granting the Debtor such further relief as necessary and appropriate.

DATED: August 8, 2010

Respectfully submitted:

/s/ Phillip G. Young_____
Phillip G. Young, Jr.
Garfinkle, McLemore & Young, PLLC
22 Public Square, Suite 12
Columbia, TN 38401
TEL: 931-388-0057
FAX: 931-381-0058
pyoung@gmylaw.com

Attorneys for the Debtor

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served through the Court's ECF system on all parties requesting notice, and mailed via electronic mail to Robert Goodrich and Beth Derrick on this the 8th day of August, 2010. I further certify that a copy of the foregoing will be served via United States Mail on the twenty largest creditors on August 9, 2010 (the first day postal service is available after the filing of this Motion).

/s/ Phillip G. Young_____
Phillip G. Young, Jr.